No. 37,111

ROBERT A. KRANTZ and LAURA A. KRANTZ, *Appellants*, v. THE CITY OF HUTCHINSON et al., *Appellee*.

(196 P. 2d 227)

 Opinion
filed July 10, 1948. 

*Donald C. Martindell,* of Hutchinson, argued the cause, and *William D. P. Carey, Wesley E. Brown, Edwin B. Brabets,* and *Robert J. Gilliland,* all of Hutchinson, were with him on the briefs for the appellants.

*Roy C. Davis,* of Hutchinson, argued the cause, and *Frank S. Hodge, Eugene A. White, Robert Y. Jones,* and *Albert S. Teed,* all of Hutchinson, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HOCH, J.: Plaintiffs owning land· in the vicinity of Hutchinson, Kan., seek to recover from the city for property damage from the overflow of floodwaters alleged to have resulted from the construction of a dike by the city officials. The city demurred to the petition on the ground that it did not state a cause of action. The demurrer was sustained and this appeal followed.

The Atchison, Topeka & Santa Fe Railway Company was named as a codefendant, but inasmuch as the city alone is involved in this appeal, the action will be here treated as one against the city only.

Summarizing, it was alleged in the petition:

Plaintiffs ·are owners of land, described, in Reno county, a portion of which is bounded by the Arkansas river, a navigable stream;

the land lies north or north and east of the Arkansas river; on or about April 30 and May 1, 1942, a serious flood from the Arkansas river was threatening the city; by virtue of this threatened flood, an emergency arose which seriously threatened to do great and irreparable damage to the streets, buildings and property of the city and to the homes and business property of certain individuals; because of this sudden and unexpected emergency and threatened damage, the board of commissioners of the city, acting in their ministerial capacity and for the sole purpose of protecting the streets and property of the city and residential and business property located therein, subject to flood damage, constructed, through the city's servants and employees, a dike known as the Risley dike, at a point about two and one-half miles above the land of the plaintiffs near the Arkansas river, and more than five miles from the city limits. The Risley dike was constructed largely on the Risley land and a portion of it on the Colladay land. The dike was constructed a number of yards back from the bank of the Arkansas river and for a distance of between one-half and three-fourths of a mile. The dike was constructed across what was an ancient waterway and formerly the natural course of the Arkansas river at flood stage. Had it not been for the construction of the dike, the high water from the Arkansas river would have flowed through its ancient waterway and natural course in flood time, down the slough, and would have emptied into Cow creek and would have done irreparable damage to the streets and property of the city, and to many residences and business properties subject to damage, amounting to hundreds of thousands of dollars. The board of commissioners acted in good faith, and for the benefit of the city and its property and to citizens whose property would have been damaged by the flood except for erection of the dike. The city, its inhabitants, and the owners of the property in the city accepted the benefits of such acts of the board of commissioners and benefited thereby in the amount of hundreds of thousands of dollars. The dike was constructed without lawful authority by the city. The dike was constructed to a height of about four feet, in utter disregard of the rights of landowners below the dike. The dike raised the level of floodwaters below the dike to a height of about four feet and prevented the floodwaters from flowing in their usual floodwater course and caused the floodwaters to flow over and across plaintiffs' land, causing great and serious damage and loss, washing out great holes

in the land, damaging crops, fences, and the land itself, which damage and loss would not have occurred had the dike not been constructed. Plaintiffs suffered damage to crops in the amount of $3,200; damage to fences $200; cost of filling in washed holes about $2,000, and permanent damage to plaintiffs' land in the sum of $10,500, or a total of $15,900, all of which was caused by the unlawful construction of the dike.

In September, 1942, Colladay, on whose land part of the dike was erected, filed a claim against the city for damages in the amount of $690, said damages being the flooding of seventy acres of growing corn and damages to alfalfa from flood. In April, 1943, Colladay filed an action in the city court against the city for such damages caused by erection of the dike by the agents of the city. The only service of summons in said action was by delivering a copy to the city clerk, without any showing of the absence of the mayor, and no summons was served on the mayor; the city filed no answer or pleading in the case and on May 6 judgment was rendered against the city for $690 with interest and costs, and thereafter the city paid said judgment and costs in the amount of $744.05. A claim was filed against the city on behalf of the owner of the Risley land for damages by reason of the erection of the dike in the amount of $500 and for $434.73 spent in removing the dike, totalling $934.73. In July, 1943, the administrator of the Risley estate, owner of the land at the time the dike was constructed, filed an action in the city court against the city for damages in the amount of $934.73. No summons was served in said action, but on July 30, 1943, the city attorney entered voluntary appearance for the city and consented to an immediate hearing, and on the same day, without any pleading of any kind having been filed by the city, judgment was rendered against the city for $934.73 with interest and costs, and on January 26, 1945, the city paid said judgment in the amount of $1,021.41. By and through the above procedure the city adopted, ratified and approved the acts of its agents and servants in constructing the dike. The city benefited by the erection of the dike "in an amount exceeding several times the amount of all of the claims filed against the city of Hutchinson for damages caused by the erection of said Risley dike." Within ninety days after they suffered their damage because of the dike, plaintiffs filed a verified claim with the city (copy thereof attached to and made a part of the petition) but the city rejected the claim. Subsequent to the

causing of the said damage to plaintiffs' property, the city "realizing that it had illegally constructed said dike, removed the same." Prayer was for recovery of damages in the sum of $15,900.

The order sustaining the city's demurrer followed.

The city contends that the acts of its officers, agents and employees in constructing the dike were *ultra vires*, and that a municipality is not liable for the *ultra vires* acts of its officers and employees. The appellants contend that this case falls within exceptions to that general rule; that a city can ratify or adopt such *ultra vires* acts and that where the *ultra vires* acts are performed solely for the benefit of the city, and the city reaps the benefits of such acts of its agents, it cannot avoid liability under the doctrine of immunity for *ultra vires* acts. Appellants further contend that the acts here involved are to be classed as "proprietary" rather than "governmental."

It is not questioned that the city had power under the statute, as it then existed (G. S. 1935, 12-635), to erect such a dike within *five miles* of the city, to protect city property from flood damage. By a subsequent amendment this limit was extended to ten miles. (G. S. 1947 Supp., 12-635.) Such power would, of course, have to be exercised in the manner provided in the statute.

As heretofore noted, the appeal is here upon the demurrer to the petition, which admits the pleaded facts. Under the established rule the petition must be liberally construed, no motion to make more definite and certain having been offered.

Boiled down, the plaintiffs allege that the city commissioners, acting for the sole and only purpose of preventing great damage which would otherwise result to the streets and property of the city and of its residents, and property owners, erected a dike beyond the five mile limit; that the purpose and effect of the dike was to divert flood water from the natural course and waterway in which it would have flowed, causing great damage to city property and other property within the city, and to turn such flood-water onto the land of the plaintiffs, where it otherwise would not have gone, thereby washing great holes in their land, damaging their crops, their fences and the land itself. Further, that this intended benefit to the city, was actually received by the city, in an amount exceeding several times the amount of all claims filed against the city on account of the erection of the dike.

No question of good faith is here involved. Indeed, the plaintiffs

assert that the city officials acted in good faith. It may be assumed also that they acted with a worthy purpose. The only question here is whether the plaintiffs must be denied any right of recovery as against the city and be limited to possible recovery against the commissioners as individuals.

Appellants concede the general rule to be that a municipality is not liable for the *ultra vires* acts of its officers and agents in the performance of strictly *governmental* duties or functions.

We have had frequent occasion in our decisions to recognize the well-established proposition that a municipal corporation has a dual capacity and exercises, correspondingly, two classes of rights and duties. One capacity is ordinarily designated as *governmental*, while the other capacity is variously referred to as *proprietary*, private, quasi-private, business, commercial or *municipal*. (43 C. J. 179 *et seq.;* 37 Am. Jur. 619, 727-729; *Water Co. v. City of Wichita*, 98 Kan. 256, 259, 158 Pac. 49; *Rose v. City of Gypsum*, 104 Kan. 412, 418, 179 Pac. 348; *State, ex rel., v. Smith*, 144 Kan. 570, 571, 61 P. 2d 897.)

In its public or governmental capacity, the municipality partakes of the sovereignty of the state. It acts as a sort of arm of the state, and as such exercises the limited governmental powers granted to it by the state.

Among typical *governmental* functions of a municipality may be mentioned: Assessment and collection of its proportion of the state tax, police regulations, suppression of crime, protection of the public health, the exercise of eminent domain, operating a fire department, administration of justice.

In 43 C. J. 182, 183, it is said that:

"When properly applied the term '*governmental* functions' should be limited to *legal duties imposed by the state upon its creature,* which it may not omit with impunity but must perform at its peril." (Italics supplied.)

and that these governmental functions are those that are *exercised for the public good, generally,* and "for the exercise of which the municipality *receives no compensation or particular benefit.*" (Italics supplied.)

. The proprietary or municipal functions of a city are defined as follows, 43 C. J. 183, 184, § 180:

"All functions of a municipal corporation, not governmental, are strictly municipal. Municipal functions are those *granted for the specific benefit and advantage of the urban community embraced within the corporated boundaries.*

Logically all those are strictly municipal functions which *specially and peculiarly promote the comfort, convenience, safety, and happiness of the citizens of the municipality,* rather than the welfare of the general public. . . . In this character the corporation stands for the community in the administration of local affairs wholly beyond the sphere of the public purposes for which its governmental powers are conferred. . . . In respect of its purely business relations as distinguished from those that are governmental, a *municipal corporation is held to the same standard of just dealing that the law prescribes for private individuals or corporations.* Then the municipality acts *for the private advantage of the inhabitants of the city,* and to a certain extent for the city itself. In such case it is not acting in its governmental capacity as sovereign, or in a legislative capacity, but is acting in a proprietary capacity, acting only in a quasi-public capacity. It is performing a function, not governmental, but often committed to private corporations or persons, with whom it may come into competition." (Italics supplied.)

37 Am. Jur. 727, 728, § 114, states the same proposition as follows:

". . . . in its *proprietary or private character, the theory is that the powers are supposed not to be conferred primarily or chiefly from considerations connected with the government of the state at large, but for the private advantage of the compact community* which is incorporated as a distinct legal personality or corporate individual; and as to such powers, and to property acquired and contracts made thereunder, the corporation is frequently regarded as having the rights and obligations of a private, rather than those of a public, corporation. . . . The *distinction between* acts in the performance of a *governmental function* and those in the performance of a corporate or *proprietary function is that in the case of the former, the municipal corporation is executing the legislative mandate with respect to a public duty generally,* while in the other, it is exercising its private rights as a corporate body. . . . *All functions* of a municipal corporation *not governmental are said to be municipal.* . . . Generally, *the distinction has been applied* to escape difficulties, *in order that injustice may not result from the recognition of technical defenses based upon the governmental character* of municipal corporations." (Italics supplied.)

Such are the broad and well-established principles upon which a city's functions are classified as either "governmental" or "proprietary." The difficulty arises in classifying particular acts. The cases involving the question are legion, and are replete with conflict and inconsistencies. In many cases it may, perhaps, be said that particular acts partake of both characteristics. Each situation should be approached in the light of the fundamental purpose of the distinction.

The doctrine of municipal immunity from liability for acts of its officers and agents in discharge of *governmental* functions has its roots in the conception of *sovereignty,* in the ancient idea that "the

king can do no wrong." (38 Am. Jur. 265 *et seq.*) Hence, the sovereign could not be sued except by consent of the sovereign. Accordingly, the municipality, exercising limited powers delegated to it by the state, has been held immune from liability for the governmental acts of its officers and agents. The inequity of a too broad application of this immunity doctrine has had a steadily increasing recognition.

In 38 Am. Jur. 266, 267, § 573, it is said:

"Notwithstanding the force of precedent, dissatisfaction with the rule of governmental immunity soon caused the courts to make a distinction between governmental functions and activities deemed to be proprietary, and in the latter case to charge municipal corporations with liability for torts the same as private corporations or individuals. *The modern tendency is to restrict rather than extend the doctrine of municipal immunity.* The courts and law writers are coming more and more to feel the injustice of the entire doctrine." (Italics supplied.)

In harmony with the above principles and distinctions, the modern doctrine is, as we are convinced it should be, to hold a municipal corporation to the same standard of just dealings to which private individuals and corporations must conform, when acting for its own private and pecuniary advantage and that of its inhabitants, rather than performing a strictly governmental function. (43 C. J. 183.)

The following statement, supported by many cited cases, is made in 38 Am. Jur. 269, § 575:

"The underlying test is stated in some of these cases to be whether the work in the course of which the tort occurred is for the common good of all *without the element of special corporate benefit or pecuniary profit.* If it is, there is no liability; *if it is not, there may be liability."* (Italics supplied.)

Also, in 38 Am. Jur. 279, § 582:

"The injustice of penalizing the victim of negligence of a municipal corporation who is in no way responsible for the unauthorized act has caused some courts to effect a relaxation of the rule and to construe more broadly the implied and general powers of municipal corporations by holding acts not *ultra vires* which, under a stricter construction, would be so held."

Having regard to the fundamental basis upon which the distinction between governmental and proprietary functions is based, we are unable to say that the acts of the city officials here complained of were in furtherance of a *governmental* function. They were not acts performed as an agency of the state, expressive of its sovereignty. They were not performed in promotion of the public welfare generally. They were performed for the special financial benefit of

the city and its property, and of its property owners. That was the controlling consideration. The acts were essentially transactions by and for the city in its individual corporate capacity.

It is somewhat difficult to follow the logic of appellee's contention that the acts complained of were both *ultra vires* and *governmental*. If they were *ultra vires*, perhaps it is anomalous to classify them at all. However, if they are to be classified it seems far more logical to say that they were acts for the local and special benefit of the corporation and the local community, as distinguished from the public generally. Moreover, "All functions of a municipal corporation, not governmental, are strictly *municipal*."

It is readily conceded that conflict of authority exists on this proposition. Be that as it may, we are impelled to subscribe to the logic and to the wholesomeness of the doctrine favorable to appellants' contention. Why should a city, however proper its purposes and however justifiable its course, be permitted to damage the property .of private individuals outside the city in order to prevent damage to its own property and other property within the city, without compensation to such individuals for the damage they have sustained? In other words, at least when no strictly governmental function is involved, but only direct and special and local gain or benefit, why should not a municipal corporation be held to the same rule of financial accountability applicable to others? Certainly no technical fiction should stand in the way of fair play and common justice.

An analogous rule, well established, is that the immunity of municipalities from liability does not extend to the creation or maintenance of nuisances. In such a case it is no defense that the municipality is exercising *governmental* power, nor that the nuisance is located on land *outside* the city where it has no jurisdiction. (43 C. J. 956; 38 Am. Jur. 348 *et seq.*) This rule has been particularly applied to damages caused by diverting waters from their natural course and thereby damaging private property. Supporting the statement with a great number of cases, the following is said in 38 Am. Jur. 352, § 645:

"On the other hand, the universal rule that one person cannot change the course of drainage and cast upon the land of another water which naturally would not have flowed there applies equally to municipal corporations, so that a municipal corporation incurs the same liability as an individual when it damages the land of another person by casting thereon water which would not have flowed there naturally, either by changing the course of drainage, by

causing surface water to accumulate and flow onto the land of another person in greater quantities than would naturally have flowed there, or by collecting surface water into artificial channels in such quantities that it overflows onto adjoining property."

Similar statements from other textbooks might be quoted. (See, also, list of many cases collected in *Johnson v. White,* 26 R. I. 207, 58 A. 658, 65 L. R. A. 250, in which the city was held liable for turning surface water upon private land; *Larrabee v. Cloverdale,* 131 Cal. 96, 63 Pac. 143.)

*Whitacre v. Charlotte,* 216 N. C. 687, 6 S. E. 2d 558, was an action to recover damages for wrongful death alleged to have been caused by the negligent failure of the defendant properly to maintain a foot bridge on private property. It was held that although the action of the city in constructing the bridge was *ultra vires,* being in *"an unauthorized place"* nevertheless the city having exercised control over the bridge could not escape liability under the doctrine of *ultra vires.*

In *Hathaway v. Osborne,* 25 R. I. 249, 55 A. 700, the city was held liable in trespass for acts of its agents in entering upon private land without right for the purpose of laying out a highway. The court rejected the city's contention that it was immune for the reason that it was not liable for the *ultra vires* acts of its agents.

In *Cardiff L. & W. Co. v. Taylor,* 73 Colo. 566, 216 Pac. 711, the plaintiff recovered a judgment against the defendant city for property damage caused by water escaping from a water main being laid to *supply water to a neighboring town.* One defense of the city was that its contract with the other city was *ultra vires.* The defense was rejected and in the opinion it was said:

"In entering into this contract with the Cardiff Company, or assuming the obligations of the contract and in supplying water to the town of Cardiff, the city is not acting as a branch of the government in its sovereign capacity, but is carrying on a business or an enterprise for a money consideration, which it has received. *It is estopped to assert that it is acting ultra vires while enjoying the fruits of that enterprise."* (p. 572.) (Italics supplied.)

*Salt Lake City v. Hollister,* 118 U. S. 256, 6 S. Ct. 1055, 30 L. Ed. 176, a decision by the United States supreme court, involved an effort by Salt Lake City to recover for certain special taxes exacted from it upon spirits alleged to have been distilled by the city. One contention of the city was that it could not be held liable for the taxes because it had no legal power to engage in the business. While the facts are by no means close to those here in-

volved, the court did make some statements very pertinent to the fundamental matter here considered. In the opinion it was said:

"It is said that Salt Lake City, being a municipal corporation, is not liable for tortious actions of its officers.

"While it may be true that the rule we have been discussing may require a more careful scrutiny in its application to this class of corporations than to corporations for pecuniary profit, we do not agree that they are wholly exempt from liability for wrongful acts done, with all the evidences of their being acts of the corporation, to the injury of others, or in evasion of legal obligations to the State or the public. A municipal corporation cannot, any more than any other corporation or private person, escape the taxes due on its property, whether acquired legally or illegally, *and it cannot make its want of legal authority to engage in a particular transaction or business a shelter from the taxation imposed by the Government on such business or transaction by whomsoever conducted.*" (pp. 262, 263.) (Italics supplied.)

See, also, cases cited 43 C. J. 934, note 7, holding that where the requisite elements of liability coexist, a municipal corporation cannot escape such liability on the plea of *ultra vires*.

In *Kelly v. Insurance Co.*, 101 Kan. 91, 98, 99, 165 Pac. 806, it was said, with citation of a long list of supporting cases:

"A long line of well-considered decisions has committed this court to the liberal view that a corporation may not avoid its obligation on a plea of *ultra vires* when it has appropriated the consideration or received the benefits of it, and when the party seeking to enforce the obligation has fully performed his share of the undertaking." (p. 98.)

*City of Coleman v. Price*, 54 Tex. Civ. App. 39, 117 S. W. 905, was an action to recover damages from the city on account of a nuisance created by the city's dumping garbage on ground beyond its corporate limits. It was held that the city's acts were performed in a corporate and not in a governmental capacity, and in the opinion it was said:

"If the city is merely exercising a corporate power, one intended for the private advantage of that locality and its inhabitants, and by its wrongful or negligent conduct inflicts damage, it would be held liable, as would be an individual or private corporation." (p. 41.)

*Mill v. Fort Collins*, 106 Colo. 229, 104 P. 2d 143, was an action for wrongful death caused by the negligent digging by the city manager of a silo on a farm outside the city. The city invoked the doctrine of *ultra vires* in defense. Following the Cardiff case, *supra*, the city was held liable, and it was said:

"Even though the contract is *ultra vires,* the city receiving a benefit from it can not set up against a third person injured by the city's negligent opera-

tions pursuant to the contract the fact of its being *ultra vires* to defeat recovery." (p. 232.)

In the case of private corporations, the defense of *ultra vires* is not looked upon with favor unless the acts complained of are wholly outside the scope of the corporate power to perform under any circumstances, and third parties dealing with it are therefore charged with knowledge of their unlawful character. Nor should the defense of *ultra vires* be applied to corporations to defeat the ends of justice or where it works legal wrong, if such result can be avoided. (*Fairbanks, Morse & Co. v. Highland Glades Drainage Dist.*, 43 F. 2d 867; *Railway Company v. McCarthy*, 96 U. S. 258, 24 L. Ed. 693; *National Carbon Co. v. Bankers' Mortgage Co.*, 77 F. 2d 614, citing 4 Encyc. U. S. Sup. Ct. Rep. pp., 745, 748, 755; *Tryson v. Southern Realty Corporation*, 51 App. D. C. 55, 274 F. 135; *Kellogg-Mackay Co. v. Havre Hotel Co.*, [CCA] 199 F. 727, 733.)

No sound reason appears why the same rule should not apply to municipal corporations when acting outside their governmental capacity. We do not say, categorically, that in no case may a municipality avoid the liability attaching to a private corporation under like circumstances, when it goes beyond its governmental functions and enters into private business transactions or performs acts for its own special benefit or for the special, pecuniary advantage and benefit of its local residents and property owners. But none now occurs to us. Certainly the instant case does not furnish such an instance.

One or two further and incidental questions call for brief comment.

The appellee suggests that the erection of the dike could not have been for the exclusive benefit of the city and its inhabitants for the reason that floodwaters from a point several miles from town, and passing through and beyond the town, would necessarily damage property other than that located in the city. Assuming such to be the case, that fact would not make the petition demurrable. It is immaterial, when testing the petition by demurrer, that property outside the city may also have been benefited.

Appellee further suggests that in any event the city could not be held liable because it is not alleged that there was either a regular or special meeting of the city commission at which the commissioners were authorized or directed to perform the acts here complained of. That argument does not appeal to us. Under the allegations ad-

mitted by the demurrer, the commissioners were acting in their ministerial capacity, for the city, for the purpose of protecting property within the city. If a city is otherwise liable for the acts of its officers and agents it cannot escape such liability merely by omitting to pass an ordinance or formal resolution specifically directing the performance of such acts. Furthermore, it is pertinent to note again, in this connection, that there was no motion to make the petition definite and certain by requiring the plaintiffs to set out by what specific authority the officers and agents of the city performed the acts complained of.

We conclude that the petition stated a cause of action against the city. The judgment is reversed and the cause remanded with direction to overrule the demurrer of the city.

HARVEY, C. J., and THIELE, J., dissent.